[Cite as *State v. McAlpine*, 2024-Ohio-2455.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | Nos. 113242 and 113751 |
| KEITH T. MCALPINE, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 27, 2024

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-22-670524-A and CR-22-667794-A

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Nora C. Bryan, Assistant Prosecuting
Attorney, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and
Rick Ferrara, Assistant Public Defender, *for appellant.*

MARY J. BOYLE, J.:

{¶ 1} In this consolidated appeal, defendant-appellant, Keith T. McAlpine ("McAlpine"), appeals his convictions for multiple counts of rape, kidnapping, having weapons while under disability, and child endangering. McAlpine argues

that (1) he was not competent to stand trial; (2) the court failed to make findings of guilt regarding the furthermore clause — "force or threat of force"; (3) there was insufficient evidence of "force or threat of force"; and (4) his convictions are against the manifest weight of the evidence. This matter involves the delayed disclosures of two unrelated children under the age of 13. For the reasons set forth below, we affirm McAlpine's convictions.

## I. Facts and Procedural History

{¶ 2} In February 2022, McAlpine was charged in a five-count indictment alleging two counts of rape with furthermore clauses alleging that the offender purposely compelled the victim to submit by force or threat of force; one count of kidnapping with a sexual motivation specification; one count of public indecency; and one count of having weapons while under disability.[1] The rape and the kidnapping counts contained sexually violent predator specifications. The named victim, H.H., was alleged to have been six years old at the time of the offenses.

{¶ 3} Three months later, in May 2022, McAlpine was charged in a nine-count indictment alleging six counts of rape with furthermore clauses alleging that the offender purposely compelled the victim to submit by force or threat of force; two counts of kidnapping with sexual motivation specifications; and one count of endangering children.[2] The rape and kidnapping counts contained sexually violent

---

[1] *State v. McAlpine*, Cuyahoga C.P. No. CR-22-667794-A (February 15, 2022).

[2] *State v. McAlpine*, Cuyahoga C.P. No. CR-22-670524-A (May 13, 2022).

predator specifications. The named victim, D.Y., was alleged to have been between the ages of nine and ten when the offenses occurred. The cases were consolidated for trial.

{¶ 4} In July 2022, McAlpine was deemed incompetent to stand trial but restorable. Dr. Michael Arnoff ("Dr. Arnoff"), Chief of Psychology with the Court Psychiatric Clinic, opined that "[McAlpine] presents with a substantial probability of being restored to competence within the time period permitted by statute." (Tr. 29.) McAlpine was ordered to outpatient competency restoration.

{¶ 5} Three months later, in October 2022, an independent doctor opined that McAlpine was restored and competent to stand trial. McAlpine moved for a second evaluation by Dr. Arnoff, which was granted. Dr. Arnoff again opined that McAlpine was not competent to stand trial but restorable; the court agreed, but this time McAlpine was sent to inpatient restoration at Northcoast Behavioral Healthcare ("Northcoast").

{¶ 6} McAlpine entered Northcoast in February 2023 and was assigned a psychiatrist as his treatment provider. After several months, the treating psychiatrist referred McAlpine for an independent evaluation because McAlpine was doing well and demonstrated that he was restored to competency. An independent forensic consultant, Dr. Megan Testa ("Dr. Testa"), was assigned to assess McAlpine's competency and she found that McAlpine was competent.

{¶ 7} In May 2023, pursuant to statute, a competency hearing was held and Dr. Testa testified that she is board certified in adult and forensic psychiatry, and

that prior to being a consultant, she worked at Northcoast where she would treat and evaluate individuals for competency restoration. She testified that she reviewed McAlpine's chart, the court's journal entry from the January 2023 hearing, Dr. Arnoff's report from December 2022, and the police reports. She stated that a summary of the previous two evaluations was incorporated in Dr. Arnoff's December report. She then interviewed McAlpine for 90 minutes and wrote a report detailing her impressions and opinions.

{¶ 8} Dr. Testa testified that she conducted a standard competency evaluation that included McAlpine's background, educational history, work history, psychiatric history, drug and alcohol history, and legal history. She testified that

> [w]e ask individuals questions about their charges, the level of seriousness, the potential punishments they're facing, the roles of courtroom personnel, and plea bargaining, we want to make sure they understand that, the basic pleas, the affirmative defense NGRI. Those are the —those are the, I guess, informational or educational parts that we want to make sure everyone understands. That's part of the competency evaluation.
>
> We also ask questions to assess their ability to assist in their defense. So, can they give some examples of plea bargains, can they talk rationally about their case, can they give us their version of the events that led to their arrest from their perspective, do they have views about legal strategy? So those are some questions to assess their ability to assist in their defense.

(Tr. 91.) Regarding McAlpine in particular, Dr. Testa testified that it was her "opinion with a reasonable degree of medical certainty that at the time of the evaluation Mr. McAlpine could understand the nature and objective of the proceedings that he faced, and . . . that at that time he had the capacity to assist in his defense." (Tr. 94.) She further testified that she could not, with the information

available to her, confirm McAlpine's diagnosis of unspecified intellectual disability. Dr. Testa stated, "That diagnosis does not disqualify someone from being competent to stand trial. . . . Plenty of people with that disorder would be found competent." (Tr. 96.) She went on to say that whether McAlpine did or did not have that diagnosis, "it does not interfere with his ability to demonstrate the adjudicative capacity." (Tr. 99.) The court found that McAlpine was competent to stand trial.

{¶ 9} In August 2023, McAlpine waived a jury and a bench trial ensued. The State called nine witnesses. The following is a summary of the evidence presented.

{¶ 10} H.H.'s mother testified that she knew McAlpine through her boyfriend who shared an apartment with McAlpine. She stated that they all spent considerable time together and she trusted McAlpine. She testified that on July 18, 2020, while her boyfriend was incarcerated, McAlpine offered to take H.H. roller skating along with his niece. She stated that McAlpine returned her daughter about an hour later, claiming that they could not go skating because his niece had an allergic reaction to a bee sting. He also stated that H.H. was sad, so he bought her a doll. H.H. was six years old at the time.

{¶ 11} H.H. was nine years old at the time of her testimony. She testified that McAlpine used to live with her stepfather and one time offered to take her roller skating with his niece. When McAlpine picked her up, the niece was not with him. She fell asleep on the drive and woke up at McAlpine's house. He said his niece got stung by a bee and could not go skating. H.H. testified that McAlpine took her

upstairs to play a video game but told her not to tell anyone because the game was for a "preteen." (Tr. 395.) She did not know what "preteen" meant but he promised her a popular doll if she played the game with him. She testified that they were in McAlpine's room but it did not have a bed, just a couch.

{¶ 12} H.H. testified that McAlpine told her to pull her pants down and she was confused because "at first I thought he meant for me to just pull like my pants up to my knee, because I knew I wasn't supposed to pull my pants down in front of anybody, but he told me what he meant and I pulled my pants down." (Tr. 398.) He told her to lie on her stomach, and he put a sock around her eyes. He told her it would feel like a pinch. McAlpine then inserted his finger into her anus, and it hurt. She testified that she went to the bathroom and saw red when she pooped but she "was little so she didn't really know why." (Tr. 402.) She testified she went back to the room because she wanted the doll and McAlpine did the same thing again and, this time, she cried and asked to go home. McAlpine called her mom, gave her the doll, and took her home. She did not tell her mom because McAlpine told not to tell because it was a game for "preteens." (Tr. 407.)

{¶ 13} H.H. eventually told her grandparents what happened with McAlpine in December 2021, after watching a television show about sexual assaults. Her grandparents then told her mother who reported the incident to the police.

{¶ 14} D.Y.'s mother testified that McAlpine was dating her cousin when the incidents happened during the school years of 2016 through 2018. She testified that her daughter was in 5th and 6th grade at that time and would sleep at her cousin's

house during the week. D.Y.'s mother explained that she worked as a bartender and her cousin had a son who went to the same school as D.Y., so her cousin took them to and from school. She testified that she noticed D.Y. acting out but did not know why. D.Y. was nine and ten during that timeframe.

{¶ 15} D.Y.'s mother testified that in September 2021, she went through her daughter's cell phone and discovered text messages about the incidents and questioned D.Y. about it. She testified that she took D.Y. to the hospital and the police were contacted.

{¶ 16} At the time of D.Y.'s testimony, she was 16 years old. D.Y. testified that McAlpine was a family friend who drove her to and from school during 5th and 6th grade. She testified that the first incident happened at the end of her 5th grade year. She testified that on the drive home from school, McAlpine told her she had to participate in a "challenge" game where she would have to answer a trivia question correctly or perform a challenge. (Tr. 228.) When she lost the "challenge," he told her to go to the back trunk area of the SUV, blindfolded her with a white t-shirt, pulled her pants down, and inserted a spoon into her vagina. (Tr. 230.)

{¶ 17} Thereafter, McAlpine took D.Y. to his home on multiple occasions, where he blindfolded her with a white t-shirt and inserted his finger into her vagina and anus, and then ultimately had vaginal and oral sex with her. McAlpine would then drive her home. D.Y. testified that the one time she told him no, he claimed she stole $20 from him and she got in trouble. She told McAlpine she hated him,

and he told her he loved her. D.Y. testified that she was too afraid to tell anyone. D.Y. testified that she does not know H.H.

{¶ 18} A sexual assault nurse examiner from University Hospitals Rainbow Babies and Children's testified regarding D.Y.'s exam. She read D.Y.'s statement describing the events. She testified that it was normal not to have any physical injuries after a sexual assault, which was the case in this instance.

{¶ 19} McAlpine was found guilty of nine counts of rape, three counts kidnapping with the sexual motivation specifications, one count of having weapons while under disability, and one count of endangering children but not guilty of the furthermore clause —causing serious physical harm. In addition, he was found not guilty of public indecency and the sexually violent predator specifications. The court sentenced McAlpine to 25 years to life in prison.

{¶ 20} McAlpine now appeals raising the following four assignments of error for review:

> **Assignment of Error I:** The trial court abused its discretion in finding appellant competent to stand trial, at the same time denying appellant his constitutional right to due process, by way of a competency determination of restorability for a condition that was unrestorable.
>
> **Assignment of Error II:** The trial court violated appellant's rights under the Sixth Amendment to the United States Constitution and Ohio law by imposing a term of 25 [years] to life on appellant as to both cases without a furthermore specification to support that sentence.
>
> **Assignment of Error III:** Insufficient evidence supported a finding of force or threat of force as to H.H.
>
> **Assignment of Error IV:** The manifest weight of the evidence did not support a conviction.

## II. Law and Analysis

### A. McAlpine Was Competent to Stand Trial

{¶ 21} Under McAlpine's first assignment of error, he argues that it was an abuse of discretion to find him competent to stand trial when he suffers from severe developmental disabilities, which makes him unrestorable. We find McAlpine's argument unpersuasive.

{¶ 22} We review a trial court's determination of competency under the abuse of discretion standard. *State v. Shine*, 2018-Ohio-2491, ¶ 19 (7th Dist.), citing *State v. Vrabel*, 2003-Ohio-3193, ¶ 33; *State v. Peters*, 2023-Ohio-2028, ¶ 18 (11th Dist.). A trial court's finding that a defendant is competent to stand trial will not be disturbed when there is some reliable and credible evidence supporting that finding. *State v. Neyland*, 2014-Ohio-1914, ¶ 32-33, citing *State v. Were*, 2008-Ohio-2762, ¶ 46; *Vrabel* at ¶ 33; *State v. Lawson*, 2021-Ohio-3566, ¶ 48 ("[a] defendant is rebuttably presumed to be competent to stand trial").

{¶ 23} A defendant is presumed to be competent unless it is demonstrated by a preponderance of the evidence that due to the defendant's present mental condition, he is incapable of understanding the nature and objective of the proceedings against him or of assisting in his defense. R.C. 2945.37(G). A defendant is competent to stand trial when he has "'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding'" and "'a rational as well as factual understanding of the proceedings against him.'" *State v. Montgomery*, 2016-Ohio-5487, ¶ 56, quoting *Dusky v. United States*, 362 U.S. 402 (1960).

{¶ 24} McAlpine argues he was not competent to stand trial because he suffers from a severe developmental disability and is unrestorable because he has an IQ of 56. However, this court has found that a trial court may not find a defendant incompetent to stand trial solely because he suffers from a mental illness or intellectual disability. *State v. McMillan*, 2017-Ohio-8872, ¶ 28-29 (8th Dist.), citing *State v. Calabrese*, 2017-Ohio-7316, ¶ 16 (8th Dist.). The test for competency focuses entirely on the defendant's ability to understand the meaning of the proceedings against him and his ability to assist in his own defense regardless of the defendant's IQ. R.C. 2945.37(G); *Neyland* at ¶ 32.

{¶ 25} A review of the record indicates that there was reliable, credible evidence supporting the court's determination that McAlpine was competent to stand trial. Dr. Testa testified that

> Mr. McAlpine did very well during the interview. He was cooperative, he was conversational, he related well. He could name his charges. He could list his charges and talk about some of the specifications that were on his charges. He understood their severity. He understood the punishments that he could face. He understood the process of plea bargaining, he could rationally describe that and give examples. He had an understanding of various plea options that would be available to him, and the outcomes of those various plea strategies. He could talk rationally about the benefits of one strategy over the other. He could discuss the NGRI defense and how that works. And he expressed a degree of trust for his lawyer, and rationally discussed his version of the events that occurred.
>
> . . .
>
> In regard to assisting in his defense, what we would ask, and what I asked Mr. McAlpine, was strategy. Does he have an idea about what strategy would be in his best interest? Does he have a degree of trust for his lawyer? He had expressed good answers to those questions. He did express a desire to work with his lawyer in his best interest,

willingness to accept advice, willingness to ask questions if there were things he didn't understand.

So all of his answers to those questions demonstrated an ability to assist in his defense. He was also, while at the hospital, very goal oriented, able to voice his needs, able to advocate for himself when he had needs within the hospital. Those things also translate to an ability to work for his best interest and work with others in for his best interest.

(Tr. 92-93.)

{¶ 26} Further, when questioned about McAlpine's IQ of 56, Dr. Testa explained that IQ alone is not sufficient to diagnose intellectual disability. It requires that a person demonstrate a level of adaptive functioning deficits. She testified that while at Northcoast, "[McAlpine] was functioning well in the unit, his adaptive functioning was good, he was able to help — he's a caretaker for his mom, he was able to call and [coordinate] various appointments and [get] a support system in line. So, he demonstrated good adaptive functioning." (Tr. 96-97.) Dr. Testa further testified, that regardless of the diagnosis, her opinion with reasonable medical certainty was that McAlpine "could assist in his defense at the time that I met with him, and he had an understanding of his charges and the nature of them, [and] the nature of the proceedings that he faced." (Tr. 97.)

{¶ 27} We further note that McAlpine was living independently, drove a car, and was previously involved in the criminal justice system — accepting a plea agreement in two cases, and opting for a bench trial in a third. His competency was never challenged in any of those cases. Thus, after reviewing the entire record, we find that there is reliable and credible evidence to support the trial court's finding of competency; therefore, we cannot say the trial court abused its discretion.

{¶ 28} Accordingly, McAlpine's first assignment of error is overruled.

**B. The Judge's Guilty Verdict Included the Furthermore Clause**

{¶ 29} Under McAlpine's second assignment of error, he argues that the trial court failed to make the furthermore finding regarding "force or threat of force" in the rape counts; therefore, he could not be sentenced to 25 years to life in prison. McAlpine relies on *State v. Bowers*, 2020-Ohio-5167, and *Alleyne v. United States*, 570 U.S. 99 (2013), for his argument. The State argues that a general verdict of guilty is sufficient to encompass the furthermore clause in a bench trial. We find that a general verdict is sufficient.

{¶ 30} McAlpine's reliance on *Bowers* and *Alleyne* is misplaced. In *Bowers,* the defendant was found guilty, by a jury, of rape of a child under 13 along with the furthermore specification that the child was under the age of 10. No other specification was included in the indictment or submitted to the jury. *Id.* at ¶ 2. Nevertheless, the trial court sentenced the defendant to 25 years to life under R.C. 2971.03(B)(1)(c), which requires the furthermore finding that the victim was compelled to submit by force or threat of force. On appeal, the Ohio Supreme Court, held that because the finding of force or threat of force increased the minimum sentence from 15 to 25 years in prison, the Sixth Amendment required that the furthermore finding of force or threat of force be made by the jury. *Id.* at ¶ 23. The court relied on the reasoning in *Alleyne*, where the United States Supreme Court held that "facts that increase the mandatory minimum sentence are elements and must be submitted to the jury and found beyond a reasonable doubt." *Id.* at 108.

Although we agree that facts that increase the mandatory minimum sentence, like the furthermore clause at issue in McAlpine's case, are elements that must be proved beyond a reasonable doubt, we do not agree that a separate finding of guilt must be made in a *bench* trial.

{¶ 31} Indeed, Ohio courts have held that Crim.R. 23(C) only requires the court in a bench trial to make a general finding regarding its verdict. *State v. Travis*, 2022-Ohio-1233, ¶ 20 (8th Dist.), citing *Cleveland Hts. v. Watson*, 2005-Ohio-3595, ¶ 15 (8th Dist.).[3] Further, in a bench trial, the court is presumed to know and apply the law correctly unless the record affirmatively demonstrates otherwise. *State v. Kilbane*, 2019-Ohio-863, ¶ 15 (8th Dist.), citing *State v. Shropshire*, 2016-Ohio-7224, ¶ 37 (8th Dist.).

{¶ 32} Here, McAlpine waived a jury and elected to have a bench trial. McAlpine was charged with nine counts of rape in violation of R.C. 2907.02(A)(1)(b) with the furthermore clause alleging that the offender purposely compelled the victims to submit by force or threat of force. After the trial, the court announced its verdict in open court, as well as through its journal entry, finding McAlpine guilty of each count of rape, which included the furthermore clause notably without

---

[3] *See, e.g., State v. Dear*, 2014-Ohio-5104, ¶ 12 (10th Dist.) (in a bench trial, there is no requirement to make a finding of serious provocation to find defendant guilty of the inferior offense of aggravated assault); *State v. Ham*, 2009-Ohio-3822, ¶ 37 (3d Dist.) (no requirement of findings of fact when tried to the bench); *State v. Baker*, 2004-Ohio-2061, ¶ 16 (3d Dist.) (in a bench trial, only a general verdict is required to find defendant guilty of trafficking in crack cocaine in violation of R.C. 2925.03(A)(2), a felony of the first degree); *State v. Lantz*, 2002-Ohio-3838, ¶ 31 (5th Dist.) (no requirement that trial court make specific findings as to the elements of an offense).

qualification. Yet when finding McAlpine guilty of child endangering, the court specifically found McAlpine not guilty of the furthermore clause that stated the offender caused serious physical harm. This qualification further supports the conclusion that the trial court intended to find McAlpine guilty of the furthermore clause included in the rape counts. Because there is no requirement under Crim.R. 23(C) that the court make a separate finding of guilt for the furthermore clause, we find that the general verdict of guilty to the nine counts of rape included the furthermore clause.

{¶ 33} Having found McAlpine guilty of the furthermore clause in the rape counts, the trial court had the discretion to sentence McAlpine to life without parole under R.C. 2907.02(B). If the court declined to do that, the court was required to sentence McAlpine to "a minimum term of twenty-five years and a maximum of life imprisonment" under R.C. 2971.03(B)(1)(c). Therefore, McAlpine's sentence of 25 years to life was proper.

{¶ 34} Accordingly, McAlpine's second assignment of error is overruled.

**C. There Was Sufficient Evidence of Force or Threat of Force**

{¶ 35} In McAlpine's third assignment of error, he argues that there was insufficient evidence of "force or threat of force" as it pertains to the crimes against H.H. We disagree.

{¶ 36} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 2009-Ohio-3598, ¶ 12 (8th Dist.). An appellate court's function when reviewing sufficiency is to

determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 37} With a sufficiency inquiry, an appellate court does not review whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *State v. Thompkins*, 1997-Ohio-52. A sufficiency of the evidence argument is not a factual determination, but a question of law. *Thompkins* at 386.

{¶ 38} In *State v. Jones*, 2021-Ohio-3311, the Ohio Supreme Court cautioned:

> But it is worth remembering what is not part of the court's role when conducting a sufficiency review. It falls to the trier of fact to "'resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" [*State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 24], quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Thus, an appellate court's role is limited. It does not ask whether the evidence should be believed or assess the evidence's "credibility or effect in inducing belief." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541. Instead, it asks whether the evidence against a defendant, if believed, supports the conviction. *Thompkins* at 390 (Cook, J., concurring).

*Id*. at ¶ 16.

{¶ 39} R.C. 2901.01(A)(1) defines "force" as any "violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." However, in cases involving sexual contact or conduct between a minor child and a

parent or parental authority figure, the Supreme Court of Ohio has held that force can be subtle and psychological and thus be proven without a showing of physical force. *State v. George*, 2024-Ohio-471, ¶ 33 (8th Dist.).

{¶ 40} In *State v. Eskridge*, 38 Ohio St.3d 56 (1988), the Ohio Supreme Court held that "[t]he force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and the relation to each other." *Id.* at paragraph one of the syllabus. The court explained that "[f]orce need not be overt and physically brutal but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." *Id.* at 58-59, citing *State v. Martin*, 77 Ohio App. 553, (9th Dist. 1946); *State v. Wolfenberger*, 106 Ohio App. 322 (12th Dist. 1958).

{¶ 41} In *State v. Dye*, 82 Ohio St.3d 323 (1998), the court held that a person in a position of authority over a child under 13 may be convicted of rape of the child with force without evidence of express threat of harm or evidence of significant physical restraint. *Id.* at 329. *See also e.g.*, *State v. Riffle*, 110 Ohio App.3d 554, 561, (9th Dist. 1996) (applied *Eskridge* to a defendant who was not the natural parent of the child victim but held a position of authority over the young child by way of his live-in relationship with the child's mother).

{¶ 42} Here, McAlpine who was nearly 35 years old at the time, was entrusted with authority and control over H.H. to take her roller skating. Instead, he drove her several miles to his home where she was alone with him. McAlpine

lured her into playing a game with him by promising her a doll. He told her not to tell anyone. He blindfolded her. She was six years old at the time. We find when viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the element of "force or threat of force."

{¶ 43} Accordingly, McAlpine's third assignment of error is overruled.

### D. McAlpine's Convictions Are Not Against the Manifest Weight of the Evidence

{¶ 44} Under McAlpine's fourth assignment of error, he argues that his convictions are against the manifest weight of the evidence because the court relied solely on the two alleged victims' testimony, which was not corroborated by physical evidence. We find McAlpine's argument unpersuasive.

{¶ 45} While the test for sufficiency requires a determination of whether the prosecution has met its burden of production at trial, a manifest weight challenge questions whether the prosecution has met its burden of persuasion. *Bowden*, *supra*, citing *Thompkins,* 1997-Ohio-52. "When considering a manifest weight claim, a reviewing court must examine the entire record, weigh the evidence, and consider the credibility of witnesses." *Id.*, citing *State v. Thomas*, 70 Ohio St.2d 79, 80 (1982). "The court may reverse the judgment of conviction if it appears that the factfinder "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered.'"" *Id.* quoting *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, (1st

Dist. 1983). A judgment should be reversed as against the manifest weight of the evidence "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin*.

{¶ 46} As this court has previously stated:

The criminal manifest weight-of-the-evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541 (1997). Under the manifest weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's? *Wilson* at *id*. Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387; *State v. Johnson*, 88 Ohio St.3d 95, 2000-Ohio-276, 723 N.E.2d 1054 (2000).

When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Wilson* at *id*., quoting *Thompkins* at *id*.

*State v. Williams*, 2020-Ohio-269, ¶ 86-87 (8th Dist.).

{¶ 47} McAlpine complains that the trial court relied solely on the testimony of two children and argues that it created a manifest injustice. However, this court has held that "[t]he testimony of one witness, if believed by the factfinder, is enough." *State v. Jenkins*, 2023-Ohio-3622, ¶ 39 (8th Dist.), quoting *In re C.A.*, 2015-Ohio-4768, ¶ 51 (8th Dist.). Furthermore, "'[a] lack of physical evidence, standing alone, does not render a defendant's conviction against the manifest weight

of the evidence.'" *State v. Williams*, 2024-Ohio-838, ¶ 49 (8th Dist.), quoting *State v. Robertson*, 2018-Ohio-2934, ¶ 32 (8th Dist.).[4]

{¶ 48} Here, H.H. testified that McAlpine was supposed to take her roller skating with his niece, but instead took her to his house. She identified State's exhibit No. 67 as a photograph of the house where McAlpine lived and described the layout of the house and the room where the assault happened. H.H. testified that McAlpine promised her a doll in exchange for her keeping quiet about playing a "preteen" game with him. He blindfolded her. She described the two sexual assaults in detail; they hurt, and she cried. Her mother testified that H.H. came home and had a doll and that she complained that she saw blood when she went to the bathroom. H.H. was six years old at the time of the assaults.

{¶ 49} D.Y. testified that McAlpine would pick her up from school and instead of taking her straight home, he would take her to a dead-end street where he would make her play a "challenge" game. He would then make her move to the back of the SUV where he would blindfold her and sexually assaulted her. She described the sexual assaults in detail. This happened repeatedly over the course of nearly two years. D.Y. was nine and ten years old at the time of the assaults.

---

[4] *State v. Flores-Santiago*, 2020-Ohio-1274, ¶ 37 (8th Dist.), citing *State v. Rusnak*, 2016-Ohio-7820, ¶ 30 (7th Dist.) (fact that no physical evidence from the crime scene was presented at trial did not render verdict against the manifest weight of the evidence); *State v. Thomas*, 2018-Ohio-4345, ¶ 25 (2d Dist.) (fact that defendant's conviction was based solely on victim's testimony and not any physical evidence did not render his conviction against the manifest weight of the evidence).

{¶ 50} After reviewing the entire record, weighing all the evidence, and considering the credibility of witnesses, we cannot say that the trial court clearly lost its way. Therefore, we find that McAlpine's convictions are not against the manifest weight of the evidence.

{¶ 51} Accordingly, McAlpine's fourth assignment of error is overruled.

## III. Conclusion

{¶ 52} We find that the trial court did not abuse its discretion when it found McAlpine was competent to stand trial. In addition, a general finding of guilt in a bench trial is all that is required under Crim.R. 23(C) and that finding encompasses the furthermore clause. Further, we find that there was sufficient evidence of "force or threat of force" as it pertains to H.H. Finally, McAlpine's convictions are not against the manifest weight of the evidence.

{¶ 53} Accordingly, the judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The appellant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.


_____
MARY J. BOYLE, JUDGE

MARY EILEEN KILBANE, P.J., and
ANITA LASTER MAYS, J., CONCUR